[Cite as *State ex rel. Daily Servs., L.L.C. v. Buehrer*, 2016-Ohio-8333.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Daily Services, LLC, | : | |
| Relator, | : | |
| v. | : | No. 14AP-405 |
| Stephen Buehrer, Administrator, Ohio Bureau of Workers' Compensation, | : | (REGULAR CALENDAR) |
| Respondent. | : | |
| | : | |

---

D E C I S I O N

Rendered on December 22, 2016

---

**On brief:** *Law Office of W. Evan Price II, LLC,* and *W. Evan Price, II,* for relator. **Argued:** *W. Evan Price, II.*

**On brief:** *Porter, Wright, Morris & Arthur LLP, James A. King* and *David S. Bloomfield, Jr.,* for respondent. **Argued:** *James A. King.*

---

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

KLATT, J.

{¶ 1} Relator, Daily Services, LLC, commenced this original action in mandamus seeking an order compelling respondent, the Administrator of the Ohio Bureau of Workers' Compensation ("bureau"), to vacate the November 14, 2013 order finding that relator is the successor of I-Force, LLC, and therefore, has the rights and obligations of I-Force under the workers' compensation law pursuant to former Ohio Adm.Code 4123-17-02(C) ("2006 successor liability rule"), and to enter an order finding that relator is not the successor of I-Force.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto.  The magistrate found that the undisputed facts fail to support the bureau's determination that relator "wholly succeeded" I-Force in the operation of its business.  Because relator did not wholly succeed I-Force in the operation of its business, the bureau abused its discretion in finding that relator has the rights and obligations of I-Force under the workers' compensation law.  Based upon this determination, the magistrate has recommended that we grant relator's request for a writ of mandamus.

{¶ 3} The bureau has filed three objections to the magistrate's decision.  In its first objection, the bureau contends that the magistrate erred by failing to make factual findings relevant to the merits of the successor liability issue.  In addition, the bureau contends that the magistrate should have applied a deferential standard of review to the facts already found by the adjudicating committee.  We find this argument unpersuasive.

{¶ 4} The magistrate applied a deferential standard of review to the factual findings of the adjudicating committee and the administrator designee.  In fact, the magistrate included most of those factual findings in the findings of fact section of his decision by expressly quoting the relevant portions of the adjudicating committee's decision and the decision of the administrator designee.  However, the magistrate concluded that those factual findings demonstrate that relator did not wholly succeed the business operations of I-Force.

{¶ 5} Because the magistrate made the necessary factual findings and applied a deferential standard of review to the bureau's factual findings, we overrule the bureau's first objection.

{¶ 6} In its second objection, the bureau contends the magistrate wrongly concluded that the bureau lacked a factual basis for the determination that relator wholly succeeded the business operation of I-Force for purposes of the 2006 successor liability rule.  We disagree.

{¶ 7} The bureau makes several arguments in support of this objection.  First, the bureau argues that the magistrate wrongly found that the bureau applied the wrong version of the successor liability rule.  The premise of the bureau's argument is incorrect.

The magistrate did not find that the bureau applied the wrong version of the rule. Quite the contrary, it is clear that the magistrate recognized that the bureau applied the 2006 successor liability rule. Therefore, this argument is without merit.

{¶ 8} Next, the bureau argues that there are compelling facts to support the conclusion that relator wholly succeeded I-Force's business operations for purposes of the 2006 successor liability rule, thereby permitting the bureau to transfer I-Force's rights and obligations to relator. We disagree.

{¶ 9} The 2006 successor liability rule states as follows:

> (C) Succeeding employers -- risk coverage transfer.
>
> (1) Whenever one employer succeeds another employer in the operation of a business in whole or in part, the successor shall notify the bureau of the succession. Where one employer wholly succeeds another in the operation of a business, the bureau shall transfer the predecessor's rights and obligations under the workers' compensation law. The successor shall be credited with any credits of the predecessor, including the advance premium security deposit of the predecessor. This paragraph shall apply where an employer wholly succeeds another employer in the operation of business on or after September 1, 2006.

Former Ohio Adm.Code 4123-17-02.

{¶ 10} The language of the rule indicates that the drafters recognized the difference between a whole and partial succession of business operations. Notice to the bureau is required if one employer succeeds another employer's business operations in whole or in part. But, for the transfer of a predecessor's rights and obligations under the workers' compensation law, an employer must "wholly succeed" the predecessor's business operations. There is no reference to a partial succession for the transfer of a predecessor's rights and obligations.

{¶ 11} Here, it is undisputed that relator did not purchase any of I-Force's assets. Nor did it directly acquire any of I-Force's business. We recognize that with I-Force's assistance, relator was able to attract the business of many of I-Force's former customers and it quickly hired 54 of I-Force's 71 permanent staff. Nevertheless, relator attracted only about one-third of I-Force's former customers, which represented about 50 percent of I-Force's sales. Relator also renegotiated leases for approximately 11 out of I-Force's 30

former locations. We agree with the magistrate that these undisputed facts fail to support the bureau's determination that relator "wholly succeeded" I-Force's business for purposes of the transfer of I-Force's rights and obligations under the workers' compensation law.

{¶ 12} Highlighting the "some evidence standard," the bureau points to a number of facts that it contends demonstrate that relator orchestrated a business strategy to take over the most profitable aspects of I-Force's business by cherry picking certain customers, employees, and business locations. We agree that the factual findings support the conclusion that this was relator's business strategy. Nevertheless, simply because relator acquired some of the most profitable aspects of I-Force's business does not establish that relator "wholly succeeded" the business operations of I-Force, which is the standard set forth in the 2006 successor liability rule for the transfer of a predecessor's rights and obligations under the workers' compensation law.

{¶ 13} The bureau cites to *RFFG, LLC v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 11AP-647, 2013-Ohio-241, *aff'd.*, 141 Ohio St.3d 331, 2014-Ohio-5199, *State ex rel. V & A Risk Servs. v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 11AP-742, 2012-Ohio-3583, and *AWL Transport, Inc. v. Ohio Dept. of Job and Family Servs.*, 10th Dist. No. 15AP-674, 2016-Ohio-2954 in support of its arguments. We find these cases unpersuasive. None of these cases involve a determination of whether an employer has wholly succeeded another in the operation of a business for purposes of the transfer of the predecessor's rights and obligations under the workers' compensation law. Both *RFFG* and *V & A Risk* involved successor-in-interest determinations in the context of experience ratings and whether there had been a change in the nature of the risk for the ongoing business. *AWL Transport* involved a successor-in-interest determination for purposes of unemployment compensation pursuant to a different statute that sets out a different standard. Again, none of these cases shed any light on what facts are necessary to establish that an employer has "wholly succeeded" another in the operation of a business as set forth in the 2006 successor liability rule.

{¶ 14} Lastly, the bureau argues that the relator's intent should be a factor that can be considered in determining if relator wholly succeeded I-Force's business operations. Contrary to the bureau's assertion, the magistrate did not hold that intent was an

irrelevant factor. Rather, the magistrate simply noted that in a subsequent version of the successor liability rule, intent was an express ground for authorizing the transfer of the predecessor employer's rights and obligations. That express ground does not exist in the 2006 successor liability rule. Without excluding intent as a possible factor, the magistrate concluded that by attracting only about a third of I-Force's former customers, which represented about 50 percent of I-Force's sales, hiring 54 of I-Force's 71 permanent staff, and by renegotiating leases for approximately 11 out of I-Force's 30 former locations, relator did not wholly succeed the business operations of I-Force as required by the 2006 successor liability rule. The magistrate simply noted that the result may have been different under the subsequent version of the rule.

{¶ 15} For all these reasons, we overrule the bureau's second objection.

{¶ 16} In its third and final objection, the bureau contends the magistrate erred by failing to address its argument that, because relator did not challenge the bureau's transfer of I-Force's experience rating to relator, relator cannot challenge the transfer of I-Force's rights and obligations. We agree that the magistrate did not expressly address this argument, but for the reasons suggested in the magistrate's decision, we find the argument unpersuasive.

{¶ 17} There is a significant difference between determining succession in the context of experience rating where the focus is on whether there has been a change in the business functions and the nature of the workplace risk, and succession for purposes of the transfer of rights and obligations under the workers' compensation law, where the focus is on whether an employer has wholly succeeded the business operations of a predecessor employer.

{¶ 18} Therefore, relator's failure to contest the transfer of I-Force's experience rating does not preclude relator's argument that it did not wholly succeed I-Force's business operations for purposes of the transfer of I-Force's rights and obligations. For these reasons, we overrule the bureau's third and final objection.

{¶ 19} Following an independent review of this matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law

contained therein.    In accordance with the magistrate's decision, we grant relator's request for a writ of mandamus.

*Objections overruled; writ of mandamus granted.*

TYACK and BRUNNER, JJ., concur.

———————

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Daily Services, LLC, | : | |
| Relator, | : | |
| v. | : | No. 14AP-405 |
| Stephen Buehrer, Administrator, Ohio Bureau of Workers' Compensation, | : | (REGULAR CALENDAR) |
| | : | |
| Respondent. | : | |
| | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on May 11, 2016

*Law Office of W. Evan Price II, LLC,* and *W. Evan Price, II,* for relator.

*Porter, Wright, Morris & Arthur LLP, James A. King* and *David S. Bloomfield, Jr.,* for respondent.

IN MANDAMUS

{¶ 20} In this original action, relator, Daily Services, LLC ("Daily Services" or "relator"), requests a writ of mandamus ordering respondent, the Administrator of the Ohio Bureau of Workers' Compensation ("administrator" or "bureau"), to vacate the November 14, 2013 order of the administrator's designee finding that relator is the successor to I-Force, LLC ("I-Force") and therefore liable for the rights and obligations of I-Force pursuant to former Ohio Adm.Code 4123-17-02(C)(1), and to enter an order finding that relator is not the successor of I-Force.

Findings of Fact:

{¶ 21} 1. In a prior decision in this action, *State ex rel. Daily Services, LLC v. Buehrer,* 10th Dist. No. 14AP-405, 2015-Ohio-4956, this court determined that the bureau retained jurisdiction over an October 15, 2009 order of its adjudicating committee ("AC") that had ruled on relator's protest and affirmed the bureau's experience combination of Daily Services and I-Force. This court held that the bureau had appropriately exercised its jurisdiction through an order issued by its AC following a March 20, 2013 hearing and an order issued by the administrator's designee following a November 14, 2013 hearing. This court held that the bureau had retained jurisdiction to adjudicate that portion of relator's protest regarding its liability for the rights and obligations of I-Force. This court remanded this action to the magistrate with instructions to address the merits of the successor liability determination by the March 20, 2013 AC and the November 14, 2013 administrator's designee.

{¶ 22} 2. As noted in the prior findings of fact, I-Force was in the business of providing temporary staffing services to its customer employers. Up to the time it closed its business on or about March 23, 2009, I-Force was owned by Ryan Mason. I-Force had opened a workers' compensation policy with the bureau in April 2006. Daily Services was also in the business of providing temporary staffing services to its customer employers. Daily Services was also owned by Ryan Mason at the time that I-Force closed its business.

{¶ 23} 3. As noted in the prior findings of fact, in April and May 2009, the bureau conducted an audit of Daily Services. By letter dated May 22, 2009, the bureau notified relator that it is the successor employer of I-Force, that Daily Services is responsible for the financial rights and obligations of I-Force, and that the experiences of I-Force and Daily Services were being combined to establish the premium rate for Daily Services.

{¶ 24} 4. By letter dated June 15, 2009, relator's counsel protested the bureau's decision.

{¶ 25} 5. Following an October 15, 2009 hearing, the bureau's AC issued an order that affirmed the experience combination based on agreement of the parties. However, the order failed to determine whether Daily Services was the successor of I-Force for purposes of imposing I-Forces' liabilities on Daily Services.

{¶ 26} 6. Following a complexity of legal proceedings in the courts, on March 20, 2013, the bureau's AC heard relator's protest. Thereafter, the AC issued a lengthy order (23 pages). Approximately nine of those pages are reprinted here:

**Background Facts and Issues Presented:** In May 2009, the Bureau determined that Daily Services, LLC was the successor to I-Force, LLC and responsible for I-Force's unpaid premiums. In June 2009, the Bureau issued invoices to Daily Services, billing Daily Services for I-Force's unpaid premiums. The invoices noted that Daily Services was the successor to I-Force, LLC and responsible for I-Force's unpaid premiums, stating that, "[a]s the successor to I-Force LLC, you are responsible for any total balance shown on the Invoice/Statement for this policy."

In a letter dated June 15, 2009, the employer protested the Bureau's determination that Daily Services was a successor in interest to I-Force within the meaning of O.A.C. 4123-17-02(C). Specifically, the employer argued that the "amount invoiced is a liability solely of I-Force, not Daily [Services]...."

On October 15, 2009, the Bureau's Adjudicating Committee held a hearing on the employer's protest. The statement of facts for that hearing noted that the Bureau would determine, first, whether I-Force's experience should be transferred to Daily Services under O.A.C. 4123-17-02(B), and, second, whether Daily Services was a successor to I-Force and thus was liable for I-Force's obligations under O.A.C. 4123-17-02(C).

In a decision dated October 15, 2009, the Adjudicating Committee held that I-Force's experience should be transferred to Daily Services under O.A.C. 4123-17-02(B). As determined by two judges of the Franklin County Court of Common Pleas, however, the Adjudicating Committee never determined the second issue, *i.e.,* whether Daily Services was a successor to I-Force and thus was liable for I-Force's obligations under O.A.C. 4123-17-02(C).

Therefore, this hearing is scheduled with the Adjudicating Committee to provide the employer the opportunity to fully administratively adjudicate the Bureau's determination on successor liability under O.A.C. 4123-17-02(C).

**Employer's Position:**
I-Force did not voluntarily transfer its business operations so that Daily Services wholly succeeded I-Force for workers' compensation purposes. In "trying to figure out who succeeded I-Force, you look at I-Force and say where did its customers go?" (Transcript of Hearing at 58, hereinafter, Tr. at ___). See Hearing Brief of Daily Services, transcript of hearing, and discussion below for details of position.

**Bureau's Position:**
The question is, is Daily Services a transferee of I-Force's business? Daily Services agreed it wholly succeeded I-Force in the 2009 hearing. An employer does not wholly succeed for one purpose and not wholly succeed for another. In February of 2009, Mr. Ryan Mason renamed Daily Services to Talocity because Daily Services denotes day laborers and that is not what I-Force did so a name change was needed. The date of the transfer of operations was March 23, 2009. Mr. Mason directed the employees of I-Force, now Daily Services to transition the business slowly so red flags don't go off in the eyes of the bureau. This is the same business. It's just operating under a different name, but a year later it's operating under the same name. Fifty percent of sales from customers were transferred from I-Force to Daily Services. Daily Services identified and shed client employers with a poor claims record. Exhibit 28 shows a comparison of I-Force's website in February 2009, before the sale, with I-Force's website today and the history of the company going back to 1996 is the same. The [*State ex rel. Cleveland Professional Football, LLC v. Buehrer,* 10th Dist. No. 11AP-428, 2012-Ohio-6020] and [*State ex rel. K&D Group, Inc. v. Buehrer,* 135 Ohio St.3d 257, 2013-Ohio-734] cases do not apply to this scenario. The [*State ex rel. RFFG, LLC v. Ohio Bureau of Workers' Comp.,* 10th Dist. No. 11AP-647, 2013-Ohio-241] case does apply because the experience combination was upheld and both companies are temporary help businesses.

### Statement of Facts

[One] Per counsel for Daily Services at hearing, "I-Force before 2006 was a division of Mancan, which is part of Manpower, and in 2006, I-Force was - - the assets of a portion of Mancan were sold and that was what created I-Force and Daily Services...." (Tr. at 72). Mancan was owned by Ryan Mason's father and Ryan Mason managed the

Columbus/Central Ohio division of Mancan. (Tr. at 73). Mr. Mason acquired the Central Ohio division of Mancan. Id.

[Two] Daily Services is a temporary employment service agency owned by Ryan Mason operating out of Columbus, Ohio.

[Three] Daily Services has had a workers' compensation policy (1495057) since April 3, 2006.

[Four] For payroll reporting period 01/01/2008 - 06/30/2008, Daily Services reported $197,470.00 in payroll.

[Five] For payroll reporting period 07/01/2008 - 12/31/2008, Daily Services reported $691,324.00 in payroll.

[Six] For payroll reporting period 01/01/2009 - 06/30/2009, Daily Services reported $5,298,626.00 in payroll.

[Seven] Daily Services was participating in a group rating program the second half of 2008 and first half of 2009, and was credit rated with an experience modifier of 0.15.

[Eight] I-Force is a temporary employment service agency owned by Ryan Mason operating out of Columbus, Ohio.

[Nine] I-Force opened a workers' compensation policy (1484986) effective 12/19/2005.

[Ten] Force and Daily Services are located in adjacent buildings on Morse Road in Columbus.

[Eleven] Daily Services registered the trade name Talocity with a date of first use 2/16/2009.

[Twelve] In 2008, Mr. Mason applied for self-insured status for I-Force and Daily Service. The Self-Insured Review Panel denied the application. An appeal to the Administrator's Designee was denied.

[Thirteen] For payroll period 01/01/2008 - 06/30/2008, I-Force reported $26,363,641.00 in payroll that resulted in a premium of $210,413.74 based on its experience modifier established for that reporting period while participating in a group rating program.

[Fourteen] Due to a poor claims history, I-Force lost group rating status on June 30, 2008.

[Fifteen] In the second half of 2008 I-Force's experience modifier increased to 1.80. An experience modifier above 1.00 is penalty rated.

[Sixteen] For payroll period 07/01/2008 - 12/31/2008, I-Force's payroll of approximately $28,000,000 generated a premium of approximately $3.5 million dollars.

[Seventeen] For payroll reporting period 07/01/2008 — 12/31/2008, premiums were due by February 28, 2009. I-Force filed a payroll report but did not make the payroll payment for the second half of 2008.

[Eighteen] In April and May of 2009, the Bureau initiated and was conducting an audit of Daily Services.

[Nineteen] On April 29, 2009, the Bureau executed a subpoena where payroll records and client lists were obtained.

[Twenty] As part of this audit, on 5/12/2009 and 5/19/2009, an auditor with the Employer Compliance Department and investigators from the Special Investigations Unit conducted interviews of former employees of I-Force.

[Twenty-one] The following statements were made by Daily Services through counsel:

The contracts between I-Force and its customers were not assignable. (Tr. at 47). I-Force did sign up its customers with requirements contracts. Id. The customers at anytime could choose to leave and go somewhere else. Id. I-Force did not transfer any contracts to Daily Services. Daily Services did solicit former I-Force customers. (Tr. at 54). "I-Force had no ability to either obligate a customer to continue using I-Force or to assign a customer to a third party, whether it be Daily Services, Resource Staffing, or anyone else." (Tr. 55).

When "I-Force closed down, it had 71 permanent staff that were employed." (Tr. at 62). The week before "I-Force closed down, it had 800 temporary employees out on assignment." (Tr. at 62-63). When I-Force closed "all of those people were terminated, were let go. The permanent staff was released, as was the temporary employees." (Tr. at 63). When I-Force

shut down, Daily Services "had something like six or seven" permanent employees and hired a number of I-Force's permanent employees. (Tr. at 64). Daily Services made job offers "to virtually everyone" and on "the next pay date, or the first that came after that, 54 of those folks were then employed by Daily Services." Id. They were terminated on Friday and most accepted positions at Daily Services. (Tr. at 66). "I-Force did not have the right to sell or assign its permanent staff to anyone..." (Tr. at 71-72). Some of the permanent staff are long-time employees doing the same thing - some were "previously employed by Mancan when I-Force was still part of Mancan...." (Tr. at 73).

"Daily Services took over the former headquarters...they took over the headquarters facility." (Tr. at 67-68). "I-Force had 31 offices, locations...So it had a main office here but it had 30 around the state. You got one person at each of these locations. Most of those locations were closed down and those people were let go or transferred to another location. So the majority of I-Force's workforce as far as permanent staff wasn't all housed in a single location." (Tr. at 68). "Twenty of the 31 closed down." (Tr. at 70). Daily Services had one location in Columbus and did not have satellite offices. (Tr. at 69-70). The remaining 11 became Daily Services and "as you go forward in the years, more were opened." (Tr. at 70).

Daily Services asserted that "I-Force's leases were terminated or breached. Daily Services went in and signed new leases for the properties, to the extent they were able to. Some of the properties were actually owned by Ryan Mason personally. They have previously been leased by I-Force and were subsequently leased by Daily Services." (Tr. at 92). "[T]he properties weren't transferred, I-Force shut down, had 31 locations and Daily Services was able to lease 11 of those locations thereafter." (Tr. at 93). Daily Services took over the computer leases of I-Force. (Tr. at 113). Daily Services made all of their quarterly tax payments to the Federal Government. Id.

[Twenty-two] Based on her interviews with former employees and knowledge of the Special Investigations Unit investigation, Nancy Archer testified to the following:

a) Mr. Mason had his employees contact his I-Force clients who were to contact and resign [sic] them to Daily Services. (Tr. at 138).

b) The contracts mirrored those of I-Force with the only difference being the name of the company and contracting services. (Tr. at 138).

c) The clients were not notified that at the time they could solicit other agencies for services. (Tr. at 138).
d) The staff employees were moved from one company to the other over a weekend and were required to sign no-compete clauses and some employees were asked to backdate those employee forms to March of 2009. (Tr. at 139).

e) There was no interview process, there was no termination or rehire process, but simply the employees were moved from one company to the other over a weekend. (Tr. at 139).
f) Referring to the email in Joint Exhibit 8, Ms. Archer testified the email was significant because "they submitted to us kind of a timeline of evidence for a slow changeover, not to raise any red flags to the Bureau." (Tr. at 148).

g) Ms. Archer also testified about a ranking system that was used to determine which clients Daily Services would want to keep from I-Force where the client employers were ranked between 1 and 3. (Tr. at 148-150).

h) The strides to alleviate the high workers' compensation premiums are very evident here. (Tr. at 151). I-Force's "e-mod was going from maybe 18 to a 120, I think, in the second half of '08." Id.

i) The other red flags were evident outside of the interviews that were conducted. A temporary services agency is required to use the same manual codes that their clients have and must notify the Bureau who the client is so the proper manual code can be assigned. During the months of April and early March of 2009, BWC's Workers' Compensation Insurance System (WCIS) reflects an extreme number of notes for new manual codes to be added to the Daily Services' account. (Tr. at 151). This indicates "they were preparing to move the clients, from I-Force to Daily so the manual codes would he there so when they had to report the payroll under that six months, there would be three months under one company and three months under the other." (Tr. at 152).

j) "Based on the interviews...the regional supervisors were sent out with new contracts and told them to let the customers know that it was just a name change, it would be no interruption of their services, that they were just wanting

them to sign the new paperwork with the new Talocity name on it." (Tr. at 160).

k) In a temporary agency, there are two main things that drive a temporary agencies' profit: 1) the workers' compensation and unemployment costs. (Tr. at 150).

l) SIU investigators went to all the locations and verified that the I-Force information on "the doors and outside signage had all been covered over with Talocity names." (Tr. at 188).

[Twenty-three] Joint Exhibit 8 contains a copy of an email from Ryan Mason titled "New Beginning," that states:

Today's is an exciting day. A new beginning means a fresh start and change. The iforce [sic] brand is no longer. The Talocity brand has been growing. Please start making communication and signage changes immediately. Please make this as seamless as possible. We will be getting everyone together to discuss clarity on the direction of our organization.

[Twenty-four] Joint Exhibit 8 contains a copy of an email from Ryan Mason titled "Dedication," that states:

You stayed late and got it done. Thank you. Many of us would not be here today if it wasn't for you. This is exactly what makes this organization the best. This type of dedication, patience and hard work makes me very proud to know that we have a solid core of employees. No more do we have time for finger pointing, drama and useless distractions. It's the teamwork, respect and the fighting for every customer and employee who has built the company.

* * *

[Thirty] Joint Exhibit 8 contains a printout of Talocity Staffing branch locations throughout Ohio that indicates 13 of the 16 are in the same location as I-Force locations. The three that are in different locations are in the same city as before, but with a different address.

[Thirty-one] On March 23, 2009, Ryan Mason ceased operating I-Force's line of business through I-Force, LLC.

[Thirty-two] Daily Services purchased the right to use the name "I-Force." (Joint Exhibit 11). Since then, Daily Services

has operated under the trade name "I-Force" with date of first use being listed as 05/01/2010. (Joint Exhibit 27).

* * *

### Successor Issue

The Committee has before it the issue of whether Daily Services is a successor to I-Force within the meaning of R.C. 4123.32 and Ohio Adm.Code 4123-17-02(C). The Revised Code authorizes the Bureau to transfer the experience and liabilities of a predecessor employer under the workers' compensation laws to a succeeding employer.

* * *

Both I-Force and Daily Services are Ohio limited liability companies that provide temporary staffing services to employers. Both are headquartered in Columbus, and both are owned by the same person. Ryan Mason is the sole owner of each company and he was the President of each company. (Tr. at 45-46). Daily Services provided workers on a daily basis and I-Force tended to do more industrial-type employees on a longer-term basis. Ryan Mason decided to stop operating I-Force through the veil of the legal entity I-Force, LLC. Due to a poor claims history, I-Force had lost group rating status on June 30, 2008. In the payroll reporting period for the second half of 2008 the premium for I-Force increased to approximately $3.5 million. This large increase in premiums was going to negatively affect profitability.

This is a situation where I-Force stopped operating on a Friday (March 20, 2009) as I-Force, LLC and began operating using the same employees in 11 of the same locations on Monday (March 23, 2009), as the legal entity Daily Services dba Talocity. Daily Services was not servicing the type of client employers I-Force served on Friday, but was on Monday. I-Force did not go bankrupt and there were no bankruptcy proceedings. Ryan Mason simply stopped servicing the long-term temporary staffing for client employers through a debit rated legal entity he controlled on Friday, and began operating on Monday through a different legal entity he controlled with an improved credit rating. The maneuver to avoid bad experience obviously had a positive effect on profitability.

The sudden expansion of Daily Services into a new type of temporary agency staffing operations was accomplished through a massive effort of I-Force employees to get client employers to sign new agreements with Daily Services dba, Talocity. Those same employees were employees of I-Force on Friday and subsequently employees of Daily Services dba Talocity on Monday. Some employees did not even know they were technically employed by a different legal entity until well after the transition. Some employees were confused on what to tell people about the change and how to respond to temporary workers asking how to get a copy of their W-2. One particular employee obviously had access to I-Force's tax records, but since I-Force was technically not operating as a legal entity, that employee was instructed to not release the W-2.

Over that weekend, Daily Services grew from one location in Columbus to twelve locations because it took over eleven I-Force locations. Daily Services dba Talocity also took over the headquarters facility of I-Force. Daily Services did not provide documentation or detailed factual statements on exactly how the leases for each physical location were switched from I-Force to Daily Services. However, through a separate legal entity, Ryan Mason was the owner/landlord of some of the I-Force locations. In these locations, there obviously would be no complications in simply changing the name of the tenant from I-Force to Daily Services in a new lease, and no complications in I-Force being released from a lease in a building owned by a Ryan Mason company.

Daily Services argues it is not a successor to I-Force because business operations were not transferred. There was no need to "transfer" the business operations of I-Force, LLC to Daily Services in a legal sense through a purchase agreement because both companies were owned and controlled by the same individual. This is not a situation where there are transactional documents to review to determine what was transferred. There were not assets to transfer like the typical successor scenario where a business is sold. The only asset that I-Force had that was of any significant value was its accounts receivable. (Tr. at 112). The line of credit used by I-Force was secured with these assets. Id. When Mr. Mason stopped operating through the veil of I-Force, LLC, its main creditor, Key Bank, collected the accounts receivable and used it to pay down the line of credit. Id. Federal taxes that were owed were paid and any other creditors apparently were paid. The only liability of I-Force that was not paid

during the combination of the operations of Daily Services and I-Force were the Bureau premiums reported on the payroll report for the second half of 2008.

Daily Services focuses its arguments on its customers and the head count of the number of temporary employees. Daily Services asserts that picking up roughly a third of I-Force's payroll and a third of its locations might support a transfer of experience, but not what the courts have construed is required to conclude that someone wholly succeeded another company's business operations. (Tr. 96-97). Daily Services asserts it should be compared to the competitors of I-Force because if Resource Staffing had taken over 100% of all of I-Force's payroll (book of business), the experience of I-Force may have transferred to Resource Staffing, but the liabilities should not because there was no transfer of business operations from I-Force to Resource Staffing: "Here, the I-Force operations were taken over but not just by Daily Services, they were also taken over by I-Force's competitors." (Tr. at 105).

Daily Services references Joint Exhibit 20 and points out that in the week before I-Force closed it had 800 temporary employees assigned to various locations around the state. In the week following Daily Services placed 353 temporary employees and those employees were not necessarily the same employees. (Tr. at 74). That figure is just the total number of temporary employees placed each week. Id. "[W]hen you look at just head count and when you include the temporaries as well as permanent staff, right after I-Force closed roughly 47 percent of the former head count was at Daily Services. By the end of four months, that had dropped to 22 percent. And the average over the four months is 34.7 percent." (Tr. at 75).

Daily Services posits the question "if Daily Services captured a portion of I-Force's business, what portion did it capture?" (Tr. at 75). Daily Services asserts "roughly one-third of the business that formerly belonged to — the payroll that it formerly belonged to I-Force wound up being utilized, being billed out by Daily Services in the following months." (Tr. at 76). Counsel for the Bureau pointed out that on day one of business. Daily Services had approximately half of I-Force's business. The 30 percent of the customers comprised 50 percent of I-Force sales for that snapshot period of time.

In any event, comparing the number of client employers that were resigned by Daily Services dba Talocity, is only one lens to look through in determining if Ryan Mason voluntarily transferred the business operations of I-Force to Daily Services. I-Force's book of business may have been smaller after the combination, but the decreased size of the book of business was due in part to a specific effort by Ryan Mason to no longer pursue the business of certain client employers that had poor claims history, were slow payers, or otherwise problematic. A ranking system was set up to help determine which client employers should be dropped during the campaign and to have the remaining client employers sign new agreements. Also, during this time period there was the recession that had an effect on business generally.

Moreover, counsel for Daily Services used the term "business operations" and "client employers" interchangeably, but they are not interchangeable terms. At the hearing, Daily Services described the "business operations" being taken over by not just Daily Services, but also by competitors. The "operations" of a business in a temporary staffing agency are what makes that type of a business function, such as the reputation of the owner, marketing efforts that recruit client employers and temporary employees, trade name, relationships of key employees that have ongoing informal relationships with client employers, employees, physical locations for operations, and necessary computer software hardware to manage the business. Client employers are the "product" of the business and are comparable to accounts. The number of client employers can change monthly, weekly, or daily. Client employers are not in assignable contracts that can be transferred or sold to another staffing agency, so they are technically net assets of a temporary staffing agency.

At the hearing, Daily Services was asked what would prevent Mr. Mason from having six staffing companies and transferring operations from one company to another every time the experience modifier became too high. Counsel for Daily Services responded that businesses close down all the time: "I'm not sure I've answered your question. But like I said, I think it gets back to the idea when someone closes down a company, would it be the position that you can't open another company. If you open another company, you are then going to be the successor to that company...I think it goes back to under the law you have to look at whether there was a transfer, not just where did the employees move or who is at this location...." (Tr. 99-101). Counsel for Daily

Services was unable to directly answer the question because stopping operations under one legal entity and moving operations to another legal entity under the cover of darkness over the weekend is not a business practice that can legitimately be employed by temporary staffing agencies to avoid workers' compensation premiums.

This Committee does not find that Daily Services was simply a fortuitous competitor that had the good fortune of being in the position to beat the other competitors of I-Force to its physical locations, employees, and client employers. Daily Services already shared certain facilities such as headquarters, offices, and management services; Daily Services and I-Force already cross marketed each other's services. According to the Affidavit of Rick Fazzino, Chief Financial Officer, I-Force charged Daily Services a management fee for I-Force's management services. (Exhibit D ¶ 13 to Daily Services Hearing Brief). Mr. Mason, as owner of both companies, controlled all the details of the paperwork necessary to technically stop operating under one entity, and technically begin operating under another entity.

Mr. Mason arranged to change the name of everything that was required to manage and operate the I-Force line of business to Daily Services. The employees of I-Force were told to tell client employers there was simply a name change. The line of credit that I-Force had was paid with I-Force's main asset. All of the pieces and parts that were necessary to operate I-Force's line of business were switched to Daily Services as directed by Mr. Mason. Competitors would not have even known that I-Force's entire book of business was up for grabs because it did not "close down" like a company that is going out of business closes down. All Mr. Mason did was stop operating through the legal entity I-Force on Friday, and began operating on Monday through the legal entity Daily Services dba Talocity, which was soon thereafter changed to I-Force.

If Daily Services had not already been in existence and a new application for coverage was submitted, the application would have been denied pursuant to Ohio Adm.Code 4123-17-13(C). The Bureau would have viewed Daily Services as essentially the same employer for which risk coverage previously had been provided. The Bureau policy for this rule states the rule was put in place to prevent policy manipulation being "utilized to escape previous liability" and

to "ensure that only one policy is established for any given individual, group of individuals or legal entity in light of statutory guidance and rule."

The determination that Daily Services is a successor to I-Force is just in the circumstances before this Committee. Mr. Mason's actions had the result of immediately increasing the profitably of companies he controls to the detriment of the State Insurance Fund. The Bureau has a fiduciary responsibility as a steward of the State Insurance Fund to ensure employers pay their fair share of the costs associated with workplace injuries, and to avoid subsidization by other employers that are paying their premiums as required by law. It should be kept in mind that the higher experience modifier that caused the higher premium is due to a higher than average number of claims. Experience rating is employed industry wide and is not unique to Ohio's workers' compensation system. A high experience modifier may be one indicator of an employer's lack of emphasis on workplace safety. Often, employer's that become debit rated focus on safety and what can be done to put an emphasis on a safe work environment.

### *Conclusion*

This Adjudicating Committee DENIES the Employer's protest of the transfer/Combination based on the Joint Exhibits, evidence outlined in the Statement of Facts, and the referenced testimony and evidence. The Committee finds Daily Services is a successor-in-interest to I-Force for workers' compensation purposes under Ohio Adm.Code 4123-17-02(C) and thus, liable for I-Forces obligations. Ryan Mason guided I-Force through a "seamless" takeover of I-Force's occupation or industry in such a way that Daily Services wholly succeeded I-Force for workers' compensation purposes. The maneuvering that moved business operations from one legal entity to another discussed above amounts to a voluntary transfer of business operations.

(Footnotes omitted.) (Emphasis sic.)

{¶ 27} 7. Relator administratively appealed the March 20, 2013 AC order to the administrator's designee pursuant to R.C. 4123.291.

{¶ 28} 8. Following a November 14, 2013 hearing, the administrator's designee issued an order affirming the March 20, 2013 decision of the AC.  The eight-page order of the administrator's designee states in part:

> Pursuant to Ohio Revised Code Section 4123.291, this matter came on for hearing before the Administrator's Designee on the employer's appeal of the Adjudicating Committee order dated March 20, 2013. At issue before the Administrator's Designee was the Bureau's determination that Daily Services, LLC ("Daily Services") was the successor to I-Force, LLC ("I-Force") and responsible for I-Force's unpaid premiums.
>
> In a decision dated October 15, 2009, the Adjudicating Committee held that I-Force's experience should be transferred to Daily Services under OAC 4123-17-02(B). As determined by two judges of the Franklin County Court of Common Pleas, however, the Adjudicating Committee never determined the second issue, *i.e.,* whether Daily Services was a successor to I-Force and thus was liable for I-Force's obligations under OAC 4123-17-02(C).
>
> Therefore, the Administrator's Designee hearing was scheduled to provide the employer the opportunity to fully administratively adjudicate the Bureau's determination on successor liability under OAC 4123-17-02(C).
>
> * * *
>
> The Administrator's Designee adopts the Statement of Facts ("SoF") contained in the order of the Adjudicating Committee dated March 20, 2013.
>
> * * *
>
> Determination of Successorship
>
> At issue in this case is whether Daily Services is the successor employer of I-Force under the Ohio workers' compensation laws, specifically for purposes of determining Daily Services' liability for the unpaid premium obligations of I-Force. The relevant issues in determining whether there is a successorship are whether there was a transfer of the operations of the business, in whole or in part, and whether the transfer was voluntary.

R.C. 4123.32 provides the basis for the Bureau to make successorship determinations. R.C. 4123.32(C) states:

The administrator of workers' compensation, with the advice and consent of the bureau of workers' compensation board of directors, shall adopt rules with respect to the collection, maintenance, and disbursements of the state insurance fund including all of the following:

* * *

(C) Such special rules as the administrator considers necessary to safeguard the fund and that are just in the circumstances, covering the rates to be applied where one employer takes over the occupation or industry of another or where an employer first makes application for state insurance, <u>and the administrator may require that if any employer transfers a business in whole or in part or otherwise reorganizes the business, the successor in interest shall assume, in proportion to the extent of the transfer</u>, as determined by the administrator, <u>the employer's account and shall continue the payment of all contributions due under this chapter</u>; ...

(<u>Emphasis added</u>.)

On the authority of R.C. 4123.32(C), BWC adopted Rule 4123-17-02 to further the purposes embodied in the statute. The rule has been in effect in some form since at least 1962. During the time period relevant to this case [March 2009], Paragraph (B) of the rule provided (and still provides) various scenarios to determine whether the Bureau will transfer the experience of the predecessor, in whole or in part, to the successor to establish an experience modifier rate for the successor, based upon the Bureau's determination of whether, and the extent to which, the employer succeeded another legal entity in the operation of a business. The Adjudicating Committee order dated October 15, 2009, affirmed that Daily Services wholly succeeded I-Force for purposes of experience combination under OAC 4123-17-02(B), and that order was not appealed. (SoF #42, 43)

Paragraph (C) of the rule as in effect during the time period relevant to this case (the version initially effective July 27, 2006), provided for the transfer of the liabilities of the predecessor to the successor employer where the Bureau

determines that "one employer wholly succeeds another in the operation of a business:"

(C) Succeeding employers -- risk coverage transfer.

(1) Whenever one employer succeeds another employer in the operation of a business in whole or in part, the successor shall notify the bureau of the succession. <u>Where one employer wholly succeeds another in the operation of a business, the bureau shall transfer the predecessor's rights and obligations under the workers' compensation law</u>. The successor shall be credited with any credits of the predecessor, including the advance premium security deposit of the predecessor. <u>This paragraph shall apply where an employer wholly succeeds another employer in the operation of a business on or after September 1, 2006</u>.

(<u>Emphasis added</u>.)

* * *

Daily Services argued before the Administrator's Designee and in its Hearing Brief submitted November 14, 2013 that the Ohio Supreme Court decision in *State ex rel. K&D Group, Inc. v. Buehrer,* 135 Ohio St.3d 257, 2013-Ohio-734, precludes a finding that Daily Services is a successor to I-Force because, it alleges, there was no "voluntary transfer" of business operations from I-Force to Daily Services. The *K&D Group, Inc.,* case dealt with the management of an apartment complex upon transfer of ownership of the apartment complex. The Court found in that case that the new management company was not a successor to the old management company; * * *

The Administrator's Designee finds that the Court held K&D Group, Inc. was not a successor because of the unique facts of that case, facts that are not present in this adjudication.

In that case, K&D Enterprises, Inc. contracted with Fame-Midamco Company, L.L.C. (by and through Fame-Midamco's management company, Mid-America) to purchase an apartment complex, and assigned its rights under the purchase agreement to newly created company Euclid-Richmond Gardens, Ltd. The new company hired K&D Group, Inc. to manage the apartments. K&D Group, Inc. hired some former employees of Mid-America and assumed the day-to-day operations of the complex. Under

these facts, the Court found there was no voluntary transfer of business operations from Mid-America to K&D Group, Inc.; rather, the Court held, "K&D Group merely contracted with the new owner to assume management of the existing apartment complex." *K&D Group, Inc.,* at ¶ 16. In other words, the Court held that the new owners of the complex had simply hired a new management company.

The present case is distinguishable. Both I-Force and Daily Services are owned by the same individual. Ryan Mason (SoF #2, 3), and the testimony and other evidence submitted to the Adjudicating Committee support the Committee's conclusion that, at Ryan Mason's direction (see generally Joint Exhibit 8), employees transferred the business operation of long-term temporary staffing from I-Force to Daily Services, which previously had offered only day laborer services (Tr. at 91). Among the evidence to support such conclusion, as set forth in the Adjudicating Committee's Statement of Facts and the evidence presented:

- When I-Force shut down, Daily Services "had something like six or seven" permanent employees and hired a number of I-Force permanent employees. (Tr. at 64). Daily Services made job offers "to virtually everyone" and on "the next pay date, or the first that came after that, 54 of those folks were then employed by Daily Services." Id. They were terminated on Friday and most accepted positions at Daily Services. (Tr. at 66) I-Force did not have the right to sell or assign its permanent staff to anyone..." (Tr. at 71-72) Some of the permanent staff are long-time employees doing the same thing some were "previously employed by Mancan when I-Force was still part of Mancan..." (Tr. at 73) (SoF #21)

- Daily Services asserted that "I-Force's leases were terminated or breached. Daily Services went in and signed new leases for the properties, to the extent they were able to. Some of the properties were actually owned by Ryan Mason personally. They have previously been leased by I-Force and were subsequently leased by Daily Services." (Tr. at 92). "[T]he properties weren't transferred, I-Force shut down, had 31 locations and Daily Services was able to lease 11 of those locations thereafter." (Tr. at 93). Daily Services took over the computer leases of I-

Force. (Tr. at 113). Daily Services made all of their quarterly tax payments to the Federal Government. Id. (SoF #21)

- Mr. Mason had his employees contact his I-Force clients who were to contact and re-sign them to Daily Services. (Tr. at 138)(SoF #22a)

- The contracts mirrored those of I-Force with the only difference being the name of the company and contracting services. (Tr. at 138)(SoF #22b)

- The staff employees were moved from one company to the other over a weekend and were required to sign no-compete clauses and some employees were asked to backdate those employee forms to March of 2009. * * *

- Ms. Archer also testified about a ranking system that was used to determine which clients Daily Services would want to keep from I-Force where the client employers were ranked between 1 and 3. (Tr. at 148-150)(SoF #22g)

- During the month of April and early March of 2009, BWC's Workers' Compensation Insurance System (WCIS) reflects an extreme number of notes for new manual codes to be added to the Daily Services' account. (Tr. at 151) This indicates "they were preparing to move the clients from I-Force to Daily so the manual codes would be there so when they had to report the payroll under that six months [reporting period], there would be three months under one company and three months under the other." (Tr. at 152)(SoF #22i)

- "Based on the interviews ... the regional supervisors were sent out with new contracts and told them to let the customers know that it was just a name change, it would be no interruption of their services, that they were just wanting them to sign the new paperwork with the new Talocity name on it." (Tr. at 160)(SoF #22j)

- Daily Services asserted before the Adjudicating Committee that "roughly one-third of the business

that formerly belonged to - the payroll that it formerly belonged to I-Force wound up being utilized, being billed out by Daily Services in the following months." (Tr. at 76) However, as counsel for the Bureau pointed out during the hearing, on day one of business, Daily Services had approximately half of I-Force's business. The 30 percent of the customers comprised 50 percent of I-Force sales for that snapshot period of time. (Tr. at 128-129; Joint Exhibits 21 and 21 A)

• On March 23, 2009, Ryan Mason ceased operating I-Force's line of business through I-Force, LLC. (SoF #31)

• Daily Services purchased the right to use the name "I-Force. (Joint Exhibit 11). Since then, Daily Services has operated under the trade name "I-Force" with date of first use being listed as 5/01/2010. (Joint Exhibit 27)(SoF #32)

• Daily Services dba I-Force held itself out as a continuation of I-Force on its website, which at the time of the Adjudicating Committee hearing on March 20, 2013 displayed a company history nearly identical to that on I-Force's website in February 2009, prior to I-Force's ceasing operations. (Joint Exhibit 20)

• Columbus CEO magazine's ranking of temporary staffing agencies based on the number of Central Ohio hours billed during 2008 (prior to I-Force's ceasing operations), 2011, and 2012 all list "I-Force" as the second-largest temporary staffing agency in Central Ohio, with the same address, website, and telephone number for "I-Force" on all three lists. (Joint Exhibits 29, 33)

Thus, the evidence supports the Adjudicating Committee's conclusion that Ryan Mason, as owner of both companies, orchestrated the assumption of I-Force's long-term temporary staffing business operations by Daily Services, targeting the most desirable client employers based on a ranking system, to avoid the negative experience rating and unpaid premium obligations of I-Force.

As noted above, the Court in *K&D Group, Inc.,* clearly stated that "[a] business operation may be transferred through

methods other than a purchase," and it is reasonable to find these circumstances to constitute such an occasion. For Daily Services to assert there was no voluntary transfer of business operations in this case is akin to arguing that Mr. Mason's right hand did not know what his left hand was doing.

In addition to *K&D Group, Inc.,* Daily Services cites to two Tenth District Court of Appeals cases as support that a finding of successorship against Daily Services is not appropriate; however, a reading of the cases does not support Daily Services' contention.

* * *

Daily Services cites to both the *Cleveland Professional Football* and *RFFG* cases for the proposition that, since Daily Services "did not pick up all of I-Force's business operations, customers, or employees" (Hearing Brief submitted November 14, 2013, p. 20)(emphasis in original), a finding that Daily Services wholly succeeded I-Force is improper. Daily Services' argument hinges largely on its pointing out that it did not assume 100% of I-Force's permanent staff, temporary staff, or client employers on March 23, 2009.

However, as the *RFFG* case suggests, the numbers alone are not dispositive. Like RFFG, Daily Services has not demonstrated, and the evidence submitted does not support, that the nature of Daily Services' business operations (or risks) as of March 23, 2009, forward is significantly different from that of I-Force. Instead, the evidence shows that Daily Services requested "an extreme number of new manual codes" be added to its BWC account, so as to enable it to offer the long-term temporary staffing services I-Force had offered, which it could then offer not only to I-Force clients moving to Daily Services, but to any new clients as well. (Tr. at 151-152).

In *Cleveland Professional Football,* New Gladiators could demonstrate its risk was significantly different from that of Old Gladiators, and the Tenth District accordingly found New Gladiators did not wholly succeed Old Gladiators' business operations: Daily Services, like RFFG, has not demonstrated so. Therefore, a finding that Daily Services wholly succeeded I-Force -- both for purposes of experience combination under OAC 4123-17-02(B), as the Adjudicating Committee had previously determined (see SoF #42.43), and

for the transfer of liabilities under OAC 4123-17-02(C) -- is appropriate.

\* \* \*

[T]he Administrator's Designee specifically finds, for the reasons set forth in this order and in the Adjudicating Committee order dated March 20, 2013, that Daily Services wholly succeeded I-Force for purposes of the transfer of I-Force's "rights and obligations under the workers' compensation law," including I-Force's unpaid premium liabilities, to Daily Services pursuant to OAC 4123-17-02(C)(1) as in effect at the time of the voluntary transfer of I-Force's business operations to Daily Services on March 23, 2009.

Based on the testimony and other evidence presented at the hearing, the Administrator's Designee, with the <u>Affirmation of Legal Standard Applied</u> as set forth above, AFFIRMS the decision, findings, and rationale set forth in the order of the Adjudicating Committee dated March 20, 2013.

(Emphasis sic.)

{¶ 29} 9. On May 19, 2014, relator, Daily Services, LLC, filed this mandamus action.

<u>Conclusions of Law</u>:

{¶ 30} It is the magistrate's decision that this court grant relator's request for a writ of mandamus, as more fully explained below.

R.C. 4123.32 currently provides:

The administrator of workers' compensation, with the advice and consent of the bureau of workers' compensation board of directors, shall adopt rules with respect to the collection, maintenance, and disbursements of the state insurance fund including all of the following:

\* \* \*

(B) Such special rules as the administrator considers necessary to safeguard the fund and that are just in the circumstances, covering the rates to be applied where one employer takes over the occupation or industry of another or where an employer first makes application for state insurance, and the administrator may require that if any

employer transfers a business in whole or in part or otherwise reorganizes the business, the successor in interest shall assume, in proportion to the extent of the transfer, as determined by the administrator, the employer's account and shall continue the payment of all contributions due under this chapter.

{¶ 31} Former R.C. 4123.32, effective June 30, 2006, provided:

The administrator of workers' compensation, with the advice and consent of the workers' compensation oversight commission, shall adopt rules with respect to the collection, maintenance, and disbursements of the state insurance fund including all of the following:

* * *

(D) Such special rules as the administrator considers necessary to safeguard the fund and that are just in the circumstances, covering the rates to be applied where one employer takes over the occupation or industry of another or where an employer first makes application for state insurance, and the administrator may require that if any employer transfers a business in whole or in part or otherwise reorganizes the business, the successor in interest shall assume, in proportion to the extent of the transfer, as determined by the administrator, the employer's account and shall continue the payment of all contributions due under this chapter.

{¶ 32} At the time the bureau conducted its audit of Daily Services in April and May 2009, as well as the time of the October 15, 2009 AC hearing, former R.C. 4123.32(D) was effective and applicable herein. It can be noted that former R.C. 4123.32(D) and current R.C. 4123.32(B) read essentially the same for purposes of this action.

{¶ 33} Effective July 5, 2010 and currently, Ohio Adm.Code 4123-17-02 provides:

(C) Succeeding employers - risk coverage transfer.

(1) Whenever one employer succeeds another employer in the operation of a business in whole or in part, the successor shall notify the bureau of the succession. Where one employer wholly succeeds another in the operation of a business, the bureau shall transfer the predecessor's rights and obligations under the workers' compensation law:

(a) The successor expressly or impliedly agrees to assume such obligations;

(b) The succession transaction amounts to a de facto consolidation or merger;

(c) The successor is merely a continuation of the predecessor; or

(d) The succession transaction is entered into for the purpose of escaping obligations under the workers' compensation law.

If one or more of the criteria set forth in this paragraph is met, the bureau shall transfer the predecessor's rights and obligations under the workers' compensation law, regardless of whether the predecessor's transfer to the successor was voluntary or through an intermediary bank or receivership.

{¶ 34} Effective July 27, 2006, former Ohio Adm.Code 4123-17-02 provided:

(C)  Succeeding employers -- risk coverage transfer.

(1) Whenever one employer succeeds another employer in the operation of a business in whole or in part, the successor shall notify the bureau of the succession. Where one employer wholly succeeds another in the operation of a business, the bureau shall transfer the predecessor's rights and obligations under the workers' compensation law. The successor shall be credited with any credits of the predecessor, including the advance premium security deposit of the predecessor. This paragraph shall apply where an employer wholly succeeds another employer in the operation of a business on or after September 1, 2006.

{¶ 35} It can be observed that former Ohio Adm.Code 4123-17-02(C) was in effect and applicable at the time of the bureau audit during April and May 2009, as well as at the time of the October 15, 2009 AC hearing.  It can be further noted that paragraphs (C)(1)(a) to (d) were added to Ohio Adm.Code 4123-17-02(C), effective July 5, 2010. Therefore, paragraphs (C)(1)(a) to (d) of current Ohio Adm.Code 4123-17-02 are not applicable to the instant action.

{¶ 36} Based upon the statute, former R.C. 4123.32(D) and its supplementary rule, former Ohio Adm.Code 4123-17-02(C)(1) effective July 27, 2006, the issue before the

March 20, 2013 AC and the November 14, 2013 administrator's designee was whether Daily Services "wholly succeeds" I-Force "in the operation of a business" as those terms appear in former Ohio Adm.Code 4123-17-02(C)(1).

{¶ 37} To further clarify, notwithstanding the language in former R.C. 4123.32(D) regarding an employer who "transfers a business in whole or in part," the issue before the March 20, 2013 AC and November 14, 2013 administrator's designee was not whether I-Force had transferred a business in whole or in part.  This is so because former R.C. 4123.32 commands the administrator to adopt special rules as described in the statute. Notwithstanding the statutory command, the administrator has not adopted a special rule providing that "if any employer transfers a business in whole or in part * * * the successor in interest shall assume, in proportion to the extent of the transfer, as determined by the administrator, the employer's account."

{¶ 38} Again, former R.C. 4123.32, as well as current R.C. 4123.32 are written as a statutory command that the administrator shall adopt rules as specified in the statute. Therefore, it is the rule that provides the standard applicable here.

{¶ 39} While the issue before the March 20, 2013 AC and the November 14, 2013 administrator's designee was whether Daily Services "wholly succeeds" I-Force, unfortunately, the Ohio Administrative Code does not define the term "wholly succeeds." Nor does the case law.

{¶ 40} Here, relator makes the same point:

> Despite the guidance provided by * * * recent decisions, no cases have addressed the precise question presented here: what does "wholly succeed" mean in OAC 4123-17-02(C)?

(Relator's Brief, 49.)

{¶ 41} According to relator, the evidence shows that Daily Services only succeeded to a "portion" of I-Force.  (Relator's Brief, 12.)  Because the alleged succession to only a portion of I-Force's business is insufficient under former Ohio Adm.Code 4123-17-02(C) to permit the bureau to transfer I-Force's rights and obligations, relator concludes that the bureau abused its discretion, and this court must order the bureau to grant relator's protest as to the transfer of I-Force's rights and obligations.

{¶ 42} In support of its position, relator discusses several cases which are not on point, but may be helpful in deciding this action.

{¶ 43} Relator discussed at length three cases which the magistrate shall discuss here.

{¶ 44} The first case is this court's decision in *State ex rel. RFFG, LLC v. Ohio Bureau of Workers' Comp.,* 10th Dist. No. 11AP-647, 2013-Ohio-241, affirmed without published opinion, 135 Ohio St.3d 1406, 2013-Ohio-1506, which relator refers to as the "Ameritemps Case." (Relator's Brief, 36.)

{¶ 45} In the Ameritemps case, the bureau determined that RFFG, LLC ("RFFG") was the successor to Ameritemps, Inc. ("Ameritemps"), and therefore subject to the risk expenses of Ameritemps for purposes of contribution rates for workers' compensation.

{¶ 46} Ameritemps was purchased by WTS Acquisition Corporation ("WTS") and subsequently transferred to RFFG. The purchase included a purchase of equipment, leases, contracts, general intangibles, customer lists, and good will. RFFG continued to do business under the Ameritemps name.

{¶ 47} After RFFG notified the bureau of the purchase, the bureau notified RFFG that it was considered the successor employer to Ameritemps for workers' compensation purposes.

{¶ 48} RFFG protested the bureau's finding that it was Ameritemps' successor. The protest was heard before the bureau's AC. The AC denied the protest. On the appeal to the administrator's designee, the decision of the AC was affirmed. RFFG then filed a mandamus action in this court.

{¶ 49} This court's decision to deny the writ turned on RFFG's failure to provide key information to the bureau. This court explained:

> Key information as to the risks for workers in the ongoing business was not provided. RFFG/Ameritemps may employ fewer people, but the risks associated with the work done may well be unchanged. What RFFG/Ameritemps pays BWC will be reduced if fewer people are employed but the rate per employee does not need to change just because fewer or different people may be employed doing the same tasks.

*Id.* at ¶ 10.

{¶ 50} Based on the above review of the Ameritemps case, the magistrate concludes that the case provides little guidance as to the issue here.

{¶ 51} The second case discussed by relator is this court's decision in *State ex rel. Cleveland Professional Football, LLC v. Buehrer,* 10th Dist. No. 11AP-428, 2012-Ohio-6020.

{¶ 52} The relator, Cleveland Professional Football, LLC ("New Gladiators") filed in this court a mandamus action seeking to compel the bureau to vacate its order that transferred the experience, rights, and obligations of Cleveland AFL, LLC ("Old Gladiators") to New Gladiators after finding that New Gladiators is the successor employer of Old Gladiators.

{¶ 53} Cleveland AFL, LLC, had a team called the Gladiators in the Arena Football League ("AFL"). The league underwent bankruptcy.

{¶ 54} An investor group, called Arena Football One, formed a new professional sports league and purchased certain assets of the AFL. Cleveland Professional Football, LLC agreed to run a team in the new league and purchased certain assets from the investor group. The team is called the Cleveland Gladiators ("New Gladiators").

{¶ 55} The majority owner of New Gladiators was the majority owner of Old Gladiators.

{¶ 56} However, while Old Gladiators had employed professional athletes, New Gladiators did not. Instead, the business operation of New Gladiators involved solely the sale of tickets, sponsorship, and merchandise of sports.

{¶ 57} In February 2010, New Gladiators applied for Ohio workers' compensation coverage. In May 2010, the bureau notified New Gladiators that it is the successor employer of Old Gladiators and, thus, New Gladiators is responsible for "all existing and future financial rights and obligations of the former employer [Old Gladiators]" *Id.* at ¶ 4. The letter further informed that New Gladiators' workers' compensation rate will be based upon the Old Gladiators' experience.

{¶ 58} The bureau AC held: "BWC correctly transferred and/or combined the predecessor's [Old Gladiators] experience and/or rights and/or obligations to the subsequent Employer [New Gladiators] under the Code." *Id.* at ¶ 4.

{¶ 59} On appeal to the administrator's designee, the decision of the AC was affirmed.   Thereafter, Cleveland Professional Football, LLC, doing business as the Cleveland Gladiators, filed a mandamus action in this court.

{¶ 60} This court issued a writ of mandamus, stating:

> [W]e order the BWC to vacate its order finding that New Gladiators was a successor employer to all of Old Gladiators' experience rating. We also agree with the magistrate that the BWC should issue a new order determining New Gladiators' experience rating based only upon the portion of Old Gladiators' business that was transferred to New Gladiators.

*Id.* at ¶ 9.

{¶ 61} Again, while the New Gladiators case is somewhat of interest and perhaps helpful, it provides little guidance as to the instant case.

{¶ 62} The third case discussed by relator is *State ex rel. K&D Group, Inc. v. Buehrer,* 135 Ohio St.3d 257, 2013-Ohio-734.  (Relator's Brief, 44.)

{¶ 63} In the *K&D Group* case, the Supreme Court of Ohio presents the facts of the case:

> In 2004, K&D Enterprises, Inc., contracted with Fame-Midamco Company, L.L.C., through K&D Enterprise's manager, Mid-America, to purchase an apartment complex known as the Euclid-Richmond Gardens. Prior to the closing, K&D Enterprises created a new company, Euclid-Richmond Gardens, Ltd., and assigned its rights under the purchase agreement to that new company.
>
> Euclid-Richmond Gardens, Ltd., hired appellant, K&D Group, Inc. ("K&D Group"), a property-management company, to manage the apartments, which were renamed Parkside Garden Apartments. K&D Group hired some former employees of Mid-America and assumed the day-to-day operations of the complex.
>
> The bureau conducted an audit of K&D Group in 2009 and determined that it was the successor in interest to the business operations of Mid-America. This determination authorized the bureau to base K&D Group's experience rating in part on Mid-America's past experience, which included a large workers' compensation claim.

K&D Group filed a protest, arguing that it was not a successor in interest to Mid-America, because it had not been involved in the purchase of the apartment complex and it did not acquire anything in the transaction. Following a hearing, the bureau's adjudicating committee denied the protest. The committee concluded that the bureau had correctly transferred the predecessor's experience to K&D Group as the successor in interest: "The day to day operations of the apartment complex remained the same after the purchase. The K&D Group assumed the prior leases, retained some of the former employees and operated under the same manual numbers." K&D Group's administrative appeal was denied.

*Id.* at 257-58.

{¶ 64} Following a legal analysis, the court concludes:

K&D Group has demonstrated that it has a clear legal right to the relief requested because it was not a successor in interest to the business operations of Mid-America for purposes of workers' compensation. The bureau abused its discretion when it transferred part of Mid-America's experience rating to K&D Group based on R.C. 4123.32(C) and Ohio Adm.Code 4123-17-02. Thus, we reverse the judgment of the court of appeals and issue a writ of mandamus ordering the bureau to determine K&D Group's experience rate without taking into consideration Mid-America's experience rate.

*Id.* at 260-61.

{¶ 65} The *K&D Group* case provides little guidance as to the issue in this action.

{¶ 66} Analysis begins with earlier observation that paragraphs (C)(1)(a) to (d) were added to Ohio Adm.Code 4123-17-02(C) effective July 5, 2010, and are therefore not applicable here. Nevertheless, it can be noted that currently, under Ohio Adm.Code 4123-17-02(C)(1)(d), an employer wholly succeeds another in the operation of a business when "[t]he succession transaction is entered into for the purpose of escaping obligations under the workers' compensation law." The factual findings of the March 20, 2013 AC and the November 14, 2013 administrator's designee clearly would merit a determination under current Ohio Adm.Code 4123-17-02(C)(1)(d) had that rule been adopted by the administrator at an earlier date. However, as relator asserts here:

> [T]he AC Order tried to show that I-Force's closure was part of a scheme to try and avoid paying I-Force's premiums. The Adjudicating Committee's misguided focus on intent may be explained by the fact that such intent is relevant under the current version of OAC 4123-17-02(C) quoted in the AC Order. * * * However, intent is not relevant under the version of OAC 4123-17-02(C) in effect when I-Force closed.

(Emphasis sic.) (Relator's Brief, 12.)

{¶ 67} Unfortunately, neither the March 20, 2013 AC nor the November 14, 2013 administrator's designee had available current Ohio Adm.Code 4123-17-02(C)(1)(d). Rather, the two tribunals only had available Ohio Adm.Code 4123-17-02(C)(1)'s rule that obligations shall be transferred "[w]here one employee wholly succeeds another in the operation of a business."

{¶ 68} Given the findings of the March 20, 2013 AC and the November 14, 2013 administrator's designee, it is difficult for this magistrate to conclude that the tribunals presented a factual predicate for a finding that Daily Services wholly succeeds I-Force unless this magistrate were to ignore that Ohio Adm.Code 4123-17-02(C)(1)(d) became effective on July 5, 2010, i.e., on a date subsequent to the bureau's audit and the initial hearing of the AC on October 15, 2009.

{¶ 69} Accordingly, based upon the above analysis, it is the magistrate's decision that this court issue a writ of mandamus ordering the administrator to vacate the November 14, 2013 order of his administrator's designee, and to enter an order that grants relator's protest to the extent that it is held that Daily Services did not wholly succeed I-Force with respect to the rights and obligations of I-Force.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).